NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0288n.06

No. 25-3860

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jul 02, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| MARCUS PIERCE, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| SCHWEBEL BAKING COMPANY; LOCAL | ) | DISTRICT OF OHIO |
| 377 CHAUFFEURS, TEAMSTERS, | ) | |
| WAREHOUSEMEN & HELPERS UNION, | ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

Before: BATCHELDER, MOORE, and THAPAR, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Schwebel Baking Company ("Schwebel") bakes bread in Youngstown, Ohio. Marcus Pierce worked as a driver delivering that bread to distribution centers and retailers in the region. Teamsters Local 377 (the "Union") is the collective bargaining representative for Schwebel's drivers. In September 2023, Schwebel fired Pierce for insubordination when he failed to complete a delivery in Bridgeville, Pennsylvania. After the Union declined to take Pierce's grievance to arbitration, Pierce sued Schwebel and the Union in a hybrid claim under § 301 of the Labor Management Relations Act. To prevail, he must show both wrongful termination and that the Union breached its duty of fair representation. But the "duty of fair representation does not require that a union fully pursue every grievance filed." *Driver v. United States Postal Serv.*, 328 F.3d 863, 869 (6th Cir. 2003). Because Pierce lacks evidence that

the Union acted arbitrarily, we AFFIRM the district court's grant of summary judgment to the defendants.

## I. BACKGROUND

Pierce began working for Schwebel in July 2022. R. 40-1 (Pierce Dep. at 46) (Page ID #539). He was responsible for delivering bread to locations in Bridgeville and McKeesport, Pennsylvania. *Id.* at 46–47 (Page ID #539–40). While there, he was a member of the Union. *Id.* at 49 (Page ID #542). The operative collective bargaining agreement ("CBA") outlined procedures for processing grievances, which must be filed within five days of the "knowledge [of the] occurrence upon which [the] grievance is based." R. 1-1 (CBA at 14) (Page ID #23). The CBA required just cause for an employee's discharge, *id.* at 20 (Page ID #29), and Schwebel's rules listed "[i]nsubordination or refusal to perform tasks assigned by supervisors" as among the offenses that could result in immediate discharge, R. 40-1 (Pierce Dep. at 56–57) (Page ID #549–50).

On September 1, 2023, the Friday ahead of Labor Day weekend, Pierce was scheduled to make a delivery to Bridgeville. *Id.* at 59 (Page ID #552). He left from Youngstown that evening and arrived in Bridgeville at about 8:00 p.m. *Id.* at 61 (Page ID #554). Trucks would ordinarily access the Bridgeville distribution center by turning from Hickory Grade Road onto Southpointe Drive. *Id.* at 63–64 (Page ID #556–57); R. 40-1 (Pierce Dep. Ex. 11) (Page ID #820). When Pierce arrived, however, Southpointe Drive was blocked off for repaving. R. 40-1 (Pierce Dep. at 64) (Page ID #557). Pierce turned his truck around, pulled down to the side of Hickory Grade Road and called his supervisor John Ritzler, his Union Representative Bob Ford, Sr., and a shipper

for Schwebel named Rick. *Id.* at 71–72 (Page ID #564–65). He also received a call from Jeriel ("Jay") Harris, a Schwebel supervisor. *Id.* at 73 (Page ID #566).

Accounts differ as to exactly what the others told Pierce to do, but the import is clear: Pierce was initially told he could either pull into a parking lot across Hickory Grade Road from Schwebel's distribution center, or he could complete the delivery by taking an alternative route to the Bridgeville distribution center through a parking area behind a business called "T2 Crossfit." R. 38-1 (Rosales Dep. at 8–9) (Page ID #392–93); R. 40-1 (Pierce Dep. at 76–78, 109–10) (Page ID #569–71, 602–03). Pierce did not pull into the large parking lot across the road, he said, because it was "busy that day." R. 40-1 (Pierce Dep. at 77) (Page ID #570); R. 40-1 (Pierce Dep. Ex. 11) (Page ID #820). He also declined to enter behind the T2 Crossfit because, he claimed, there was a sign saying "No Semis Allowed." R. 40-1 (Pierce Dep. at 91) (Page ID #584). A picture taken of the sign shortly thereafter did not say "No Semis Allowed," but instead indicated that the route was "Not A Thru-Way." R. 40-1 (Pierce Dep. Ex. 18) (Page ID #827). Pierce testified that he believed the sign had been altered. R. 40-1 (Pierce Dep. at 91) (Page ID #585).

After about 30 minutes, Pierce left Hickory Grade Road and began driving back towards Youngstown. *Id.* at 83–84 (Page ID #576–77). He had been told, however, to find a safe place to pull over where other smaller trucks could come and unload the bread. *Id.* at 82–83 (Page ID #575–76); R. 38-1 (Rosales Dep. at 12) (Page ID #396). Ford Sr. said in his deposition that Pierce could have "[p]ull[ed] into a place . . . , let them know . . . where you're at, and they would have come over there." R. 36-1 (Ford Dep. at 18) (Page ID #332). Pierce did not stop on his way back to Youngstown, saying that there was not "any other place that [he] could have pulled over." R. 40-1 (Pierce Dep. at 84) (Page ID #577). He didn't look around Bridgeville or off any exits on

his journey because he didn't know whether trucks were allowed in any particular place on the route. *Id.* at 84–85 (Page ID #577–78). Pierce spoke to Harris during this time, but Pierce said he did not follow Harris's instructions because he believed they were illegal. *Id.* at 95 (Page ID #588).

Still needing to deliver the bread, Schwebel had another driver, Robert Ford, Jr., complete the delivery. R. 39-1 (Behmer Dep. at 29) (Page ID #465). Ford Jr. used the route behind T2 Crossfit to make the delivery, had "no trouble" doing so, and completed the delivery around 1:00 or 2:00 a.m. on September 2. *Id.*

Later that morning, Schwebel suspended Pierce pending an investigation into his alleged insubordination and failure to complete the September 1 delivery. R. 40-1 (Pierce Dep. at 53) (Page ID #546); R. 38-1 (Rosales Dep. at 16) (Page ID #400). He did not work after that date, and on September 13 Schwebel issued a letter confirming Pierce's discharge. R. 40-1 (Pierce Dep. Ex. 7) (Page ID #783). Pierce claimed he received the letter and learned of his discharge on September 15. R. 40-1 (Pierce Dep. at 146) (Page ID #639). On September 18, Pierce contacted Steven Anzevino, the Local 377 President, about filing a grievance. R. 43-1 (Anzevino Aff. ¶ 14) (Page ID #948). At that stage, Anzevino had already taken substantial steps to investigate the September 1 incident, which included reviewing statements from several Schwebel employees involved, learning that Ford Jr. had successfully completed the delivery, discussing the issue with Pierce, traveling to the scene in Bridgeville, and analyzing Pierce's GPS data to determine whether he could have remained in Bridgeville longer without violating DOT rules. *Id.* ¶¶ 7–13 (Page ID #947–48); R. 35-1 (Anzevino Dep. at 38–39) (Page ID #266–67). Pierce filed his grievance, which demanded reinstatement and back pay, on September 19. R. 40-1 (Pierce Dep. Ex. 24) (Page ID #849).

Schwebel first denied the grievance on the ground that it was filed more than five days after his termination. R. 40-1 (Pierce Dep. Ex. 25) (Page ID #850). Pierce requested that Anzevino contest the timeliness determination on the ground that he learned of his termination only on September 15. R. 40-1 (Pierce Dep. Ex. 26) (Page ID #851). Anzevino continued to discuss the issues with Schwebel in the meantime, assessing the company's "willingness to return Pierce to his position of employment," including under a "'Last Chance Agreement' and without back pay." R 43-1 (Anzevino Aff. ¶¶ 16–17) (Page ID #948). A grievance meeting was then held on October 2, where Anzevino advocated on Pierce's behalf. R. 35-1 (Anzevino Dep. at 17) (Page ID #245). Discussion at the meeting also included the issue of Pierce's DOT hours, the T2 Crossfit sign that Pierce said had changed, and Pierce's account of the evening. *Id.* at 18–22 (Page ID #246–50). Anzevino raised the timeliness issue, and Schwebel retracted its position that the grievance was untimely. *Id.* at 25 (Page ID #253). Anzevino asked Pierce whether there was any other evidence he would like to present, and Pierce said no. *Id.* at 22–23 (Page ID #250–51).

On October 6, Schwebel wrote Anzevino to inform him that it stood "with the original decision to terminate Mr. Pierce's employment." R. 40-1 (Pierce Dep. Ex. 27) (Page ID #852). Anzevino then consulted an attorney, John Doll, who informed Anzevino that the Union was "highly, highly unlikely to win [Pierce's] case in arbitration." R. 35-1 (Anzevino Dep. at 6) (Page ID #234). Anzevino wrote to Pierce, informing him of Schwebel's decision and notifying him that the Union found the grievance "lacking merit and [would] not be taking it to arbitration." R. 40-1 (Pierce Dep. Ex. 28) (Page ID #853). The letter let Pierce know that he could appeal the decision not to arbitrate. *Id.*

Pierce exercised his right to appeal the decision. R. 40-1 (Pierce Dep. at 199) (Page ID #692). To allow enough time for that appeal, Anzevino asked Schwebel to extend the time for the Union to request arbitration, and the company granted that request. R. 35-1 (Anzevino Dep. at 24–25) (Page ID #252–53). Pierce then appeared before the Union's executive board and "told them . . . what happened that night," but did not present any new evidence or arguments for why it should take his case to arbitration. R. 40-1 (Pierce Dep. at 200–02) (Page ID #693–95). The Executive Board wrote Pierce the next day, informing him that after "again review[ing] the information in the case as well as [Pierce's] testimony," it stood by its decision not to arbitrate. R. 40-1 (Pierce Dep. Ex. 29) (Page ID #854).

Pierce filed this suit against Schwebel and the Union on April 4, 2024. R. 1 (Compl.) (Page ID #1–6). Invoking § 301 of the Labor Management Relations Act, Pierce alleged one count against Schwebel for discharge without just cause, and one count against the Union for breach of the duty of fair representation. *Id.* ¶ 4, 13–21 (Page ID #2–5). After discovery, the district court granted summary judgment to both defendants. R. 57 (Op. & Order) (Page ID #1395–1415). Pierce timely appealed. R. 61 (Notice of Appeal) (Page ID #1438).

## II. ANALYSIS

"We review a district court's grant of summary judgment de novo." *Boyd v. N. Biomedical Rsch., Inc.*, 165 F.4th 424, 431 (6th Cir. 2026). "Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017)).

Section 301 of the Labor Management Relations Act provides federal courts with jurisdiction over suits alleging violations of collective bargaining agreements. 29 U.S.C. § 185(a). An "aggrieved employee," however, must ordinarily "exhaust any exclusive grievance and arbitration procedure created in a collective bargaining agreement prior to bringing a § 301(a) suit against the employer." *Poole v. Budd Co.*, 706 F.2d 181, 183 (6th Cir. 1983). "A failure to exhaust may be excused, however, if the employee establishes that the union breached its duty of fair representation in the processing of the grievance." *Id.* (citing *Vaca v. Sipes*, 386 U.S. 171, 186 (1967)). This exhaustion principle gives rise to the "hybrid" § 301 action, which "consists of two distinct causes of action, one against the employer for violating the collective bargaining agreement . . . and one against the union for breaching its implied duty of fair representation." *Driver*, 328 F.3d at 868. An employee cannot prevail on either cause of action, however, without prevailing on both. *Id.*

A union breaches its duty of fair representation where "its conduct toward its members is arbitrary, discriminatory, or in bad faith." *Linton v. United Parcel Serv.*, 15 F.3d 1365, 1369 (6th Cir. 1994). Pierce does not claim discrimination or bad faith, D. 19 (Appellant Br. at 18–20), so we focus on whether the Union's conduct was arbitrary.[1]

"[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Linton*, 15 F.3d at 1369 (quoting *Air Line Pilots Ass'n v. O'Neill*, 499 U.S.

---

[1]Pierce does allege that the Union "chose to maintain its cozy relationship with Schwebel and Schwebel's business interests over the interests of its individual member." D. 19 (Appellant Br. at 19–20). To the extent that this conclusory statement can be read as arguing bad faith, Pierce identifies no support in the record for the proposition that the Union colluded with Schwebel or otherwise sought to advance the company's interest.

65, 67 (1991)). The Supreme Court has compared the union's duty of fair representation to "the responsibilities of corporate officers and directors toward shareholders." *Air Line Pilots*, 499 U.S. at 75. "Just as these fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith." *Id.* "Any substantive examination of a union's performance . . . must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Id.* at 78. Such deference reflects "[t]he bargaining structure that Congress created," which in turn "recognizes that collective bargaining agreements will often give unions latitude in determining how to handle disputes between employees and the employer." *Driver*, 328 F.3d at 869.

We therefore ordinarily respect a union's decision not to arbitrate an employee's grievance. An "individual employee has no absolute right to have his grievance arbitrated," and may not prevail in a § 301 action "merely by proof that the underlying grievance was meritorious." *Vaca*, 386 U.S. at 195. The union must "investigate the complaint and handle the employee's grievance fairly." *Driver*, 328 F.3d at 869; *see also Vaca*, 386 U.S. at 193. A union may not, therefore, refuse to pursue a grievance it recognizes as meritorious simply because it believes the employer's position is "intractable." *Linton*, 15 F.3d at 1371–72. Nor does a union's failure to investigate an employer's "fabricated evidence" pass muster. *Schoonover v. Consol. Freightways Corp. of Del.*, 147 F.3d 492, 494–96 (6th Cir. 1998). But when a union takes independent steps to investigate an employee's grievance and makes a reasoned decision not to arbitrate, the employee cannot prevail on his § 301 action. *Driver*, 328 F.3d at 869–70; *Poole*, 706 F.2d at 183–85. This is true even in

situations involving "negligence or mistaken judgment" on the union's part, *Poole*, 706 F.2d at 183, or evidence that the union's conclusion on the merits was "wrong," *Driver*, 328 F.3d at 870.

Applying this standard, we conclude that summary judgment was warranted because the Union "investigate[d] [Pierce's] complaint," "handle[d] [his] grievance fairly," and Pierce lacks any evidence to the contrary. *Driver*, 328 F.3d at 869. Anzevino, the Union's business representative, worked with Pierce to file his grievance. R. 43-1 (Anzevino Aff. ¶ 14) (Page ID #948). Though Anzevino may have harbored some concerns about its timeliness, he advocated for Pierce and secured Schwebel's concession that the grievance was timely filed. *Id.* ¶ 15 (Page ID #948); R. 35-1 (Anzevino Dep. at 25) (Page ID #253). Anzevino undertook an investigation into the matter, speaking to several other individuals involved, obtaining written statements, traveling to the Bridgeville distribution site, and consulting an attorney who said that the chances of success in arbitration were extremely slim. R. 35-1 (Anzevino Dep. at 6, 38–39) (Page ID #234, 266–67); R. 43-1 (Anzevino Aff. ¶¶ 7–13) (Page ID #947–48).[2] He learned that another driver had made the delivery safely and without incident. R. 43-1 (Anzevino Aff. ¶ 9) (Page ID #947). He considered Pierce's defenses of his behavior, such as the idea that staying in or near Bridgeville would have violated Pierce's DOT time limits, and reasonably concluded that Pierce could have stayed in Bridgeville for several hours longer without issue. *Id.* ¶¶ 10–13 (Page ID #947–48). The Union gave Pierce an opportunity to present his case, along with any further evidence, to its

---

[2]Pierce argues that evidence of the attorney's opinion should be excluded as hearsay. D. 19 (Appellant Br. at 19). That would be correct if it were offered for its truth—i.e., to demonstrate that Pierce's claim in fact lacked merit. We may, however, consider Anzevino's consultation with the attorney as evidence of the Union's process and reasonable belief that arbitration would be fruitless. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009) ("A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay."). The same would apply if the shoe were on the other foot. Had the attorney told Anzevino that Pierce had a strong case on the merits, Pierce could introduce that as evidence that the Union arbitrarily refused to take the grievance to arbitration. *See Linton*, 15 F.3d at 1371–72.

Executive Board before making a final decision not to pursue arbitration. R. 40-1 (Pierce Dep. at 200–02) (Page ID #693–95). And Pierce identifies no witness, argument, or evidence that the Union ignored. *Cf. Paris v. MacAllister Mach. Co.*, 175 F.4th 787, 803–04 (6th Cir. 2026) (finding union's failure to grieve an employee's demotion not arbitrary when employee did not request a grievance). All told, these actions bear none of the hallmarks of arbitrary representation that would allow Pierce to overcome the exhaustion requirement and press his § 301 claim.

Unable to make out a case that the Union's actions were arbitrary, Pierce suggests that its representation was "[p]erfunctory." D. 19 (Appellant Br. at 18) (quoting *Vaca*, 386 U.S. at 191). We lack any caselaw finding that a union's performance was so perfunctory as to be inadequate or otherwise defining what constitutes "perfunctory" representation. Other circuits, however, have made clear that the term sets a low bar. In the Seventh Circuit, an employee must point to "conduct which is so acutely perfunctory that it fails to attain a basic level of acceptable performance." *Rupe v. Spector Freight Sys., Inc.*, 679 F.2d 685, 691 (7th Cir. 1982). The Eighth Circuit has "construe[d] the Supreme Court's reference in *Vaca* to the 'perfunctory' processing of a grievance to mean that 'the union acted without concern or solicitude, or gave a claim only cursory attention.'" *Beavers v. United Paperworkers Int'l Union, Local 1741*, 72 F.3d 97, 100 (8th Cir. 1995) (quoting *Curtis v. United Transp. Union*, 700 F.2d 457, 458 (8th Cir. 1983)). The Tenth Circuit has found evidence of perfunctory representation where a union neglected to review the employer's evidence prior to a grievance committee hearing, did not present one of the employee's claims at the hearing, and told the employee he did not need to appear at the later arbitration hearing. *Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1236–37, 1239–41 (10th Cir. 1998). Whatever the proper definition of "perfunctory" in the fair-representation context, nothing of the

sort occurred here. Pierce's complaint, at bottom, is not that the Union failed to take any necessary procedural or investigatory step, but that the Union disagreed with him on the merits of his grievance. Even if this disagreement was erroneous, "[t]he grievance process is not expected to be error free." *Poole*, 706 F.3d at 184. We therefore decline to second-guess the Union's determination that Pierce's grievance did not "warrant[] resort to the arbitral machinery." *Id.*

### III. CONCLUSION

Because Pierce lacks evidence demonstrating the Union's breach of the duty of fair representation, his § 301 claim against Schwebel also fails, and we need not separately determine whether the company violated the CBA. We AFFIRM the judgment of the district court.